UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KYLE K. ZINK,

                Plaintiff,

v.                                                    Case No. 23-cv-1478-pp

DR. LABBY, *et al.*,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), RESERVING RULING ON PLAINTIFF'S MOTION FOR JOINDER (DKT. NO. 3) AND ORDERING PLAINTIFF TO PROVIDE ADDITIONAL INFORMATION ABOUT HIS CLAIMS**

      Plaintiff Kyle K. Zink, who is incarcerated at Dodge Correctional Institution and who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants provided him inadequate medical care when he was incarcerated at Redgranite Correctional Institution. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, reserves ruling on his motion for joinder, dkt. no. 3, and orders the plaintiff to provide additional information before the court may screen his complaint, dkt. no. 1.

**I. Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

      The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the

plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On November 22, 2023, the court ordered the plaintiff to pay an initial partial filing fee of $25.64. Dkt. No. 7. The court received that fee on December 26, 2023. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.     Screening the Complaint**

    A.     Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to

2

Case 2:23-cv-01478-PP    Filed 03/14/24    Page 2 of 17    Document 9

relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.   The Plaintiff's Allegations

The complaint names as defendants Dr. Kira Labby; Nurse Practitioner Burnett; Psychiatrist Dr. Stonefeld; Health Services Manager Angela Thompson; registered nurses Cindy Barter, William J. Borgen, and A. Korman; nurse K. Thompson; and Deputy Warden Eric Barber. Dkt. No. 1 at ¶¶6–14. All defendants are employees at Redgranite, and the complaint sues them in their individual capacities. Id.

The plaintiff alleges that he has Charcot Arthropathy,[1] which causes his bones and joints to become brittle. Id. at ¶16. He says that if not treated properly, this condition may lead to amputation of the affected limb. Id. He says that he was bedridden for forty-six days because of the condition in his right ankle and foot, and he says he will have to have his foot amputated when he is released from incarceration because "Defendant will not have it done while [he is] incarcerated." Id. at ¶¶15–16. The plaintiff alleges that he also suffered from "lithium toxicity," which led to "the loss of [his] ankle." Id. at ¶17. He says that all "listed defendant almost killed" him by failing "to identify and treat, and stop the lithium or check blood levels after becoming sick and unable to care for [him]self." Id. at ¶18.

The complaint alleges that sometime in August 2018, the plaintiff saw Dr. Stonefeld "for [his] mental disease and PTSD," and Stonefeld prescribed him an unspecified dosage of lithium to replace the medication he had been taking. Id. at ¶20. Soon after, the plaintiff was sent to the Redgranite infirmary, where he remained for forty-six days. Id. at ¶21. He says that during that time, he "was puking bile and could not keep anything down." Id. He eventually was sent to the University of Wisconsin Hospital, and the doctor who treated him there told him to stop taking lithium "at once." Id. at ¶21. The plaintiff says

---

[1] The plaintiff refers to his condition as "Charot's Joint Arthopathy." Dkt. No. 1 at ¶16. The court believes that he means Charcot Arthropathy, which is "a progressive condition of the musculoskeletal system that is characterized by joint dislocations, pathologic fractures, and debilitating deformities." See Charcot Arthropathy, https://emedicine.medscape.com/article/1234293-overview.

that his wife "is a professional medical diagnosis specialist," and that she saw him at Redgranite infirmary on September 22, 2018 (before he was transported to the hospital). Id. at ¶22. He says that defendants Barter, Borgen, Angela Thompson and Korman "all tried to keep [him] from visiting with her." Id. The plaintiff told his wife "that he was puking bile hasn't used the bathroom in weeks, cannot keep anything down." Id. at ¶23. She determined that the plaintiff was "in lithium toxicity and [he] look[ed] like [he was] about to die!" Id. at ¶24. The plaintiff later told Borgen what his wife said, but Borgen rebuffed the plaintiff and told him "she's not a Nurse and don't tell me how to do my job." Id. at ¶25. Later the same day, the plaintiff's wife called Redgranite and spoke with Borgen. Id. at ¶26. She told him about her education and insisted that the plaintiff "[would] be dead in a few days" if they did not immediately treat him. Id.

The next day—September 23, 2018—the plaintiff "was taken by ambulance to UWM Hospital and diagnosed with lithium toxicity by the professional doctors!" Id. at ¶27. He says he "spent days in the hospital being treated for lithium toxicity." Id. Hospital staff determined that the plaintiff's "bladder was about to burst," his intestines were "severely impacted" and his blood was "extremely toxic." Id. at ¶28. He says hospital doctors told him that if Redgranite staff had not brought him to the hospital, his "bladder would have burst" and he "would be dead" before he arrived there. Id. at ¶29.

The plaintiff alleges that defendant Barter checked on him in the infirmary before he was transported to the hospital and insisted that he was

fine and was "faking it." Id. at ¶30. He says Barter did not check his medications, report his high blood pressure to a doctor, request blood tests or "provide any nursing at all." Id. He says Barter's failure to provide adequate treatment "is why [he] must now have [his] ankle amputated." Id. The plaintiff explains that if Barter had checked his chart to see that he suffers from arthropathy and had him "up to try and walk," it could have "prevented the ankle injury." Id. He asserts that defendant Korman similarly refused to check his medical chart, tell the doctors about his high blood pressure or report his inability to urinate or defecate. Id. at ¶31. He asserts that defendant K. Thompson "told [him] to just die already!" and asked him during medical visits, "aren't you dead yet?" Id. at ¶32. The plaintiff says that defendant Barber spoke with the plaintiff's wife and threatened to "call the attorney general's office and have them take [her] medical license for falsy [*sic*] accuse [his] medical staff of trying to kill [her] husband." Id. at ¶33. He says his wife stopped calling after that threat. Id.

The plaintiff asserts that Dr. Stonefeld was deliberately indifferent for placing him on 600mg of lithium without checking his blood levels, which he says led to lithium toxicity. Id. at ¶41. He says no defendant checked his blood levels or his medical chart, which could have helped them determine that the lithium was causing his medical issues. Id. at ¶42. The plaintiff alleges that the "defendants wished [he] would have died instead of lived." Id. at ¶43. The plaintiff says that no one informed Stonefeld about his medical issue or "bothered to do any investigation." Id. at ¶44. He says that if they had, he

6

"would not now have to have [his] ankle amputated upon release" in April 2024. Id. at ¶¶44–45.

The plaintiff says that while he was in the Redgranite infirmary for forty-six days, he was not "able to walk" and did not receive "any therapy to keep [his] leg muscles, foot and ankle moving daily." Id. at ¶34. He says his muscles atrophied, and the joint around his ankle became "twist[ed] in-on-itself, dislocating the entire ankle." Id. He again alleges that he "will lose [his] right ankle/foot because of all defendants listed." Id. He alleges that when he returned to Redgranite from the hospital, he could not walk. Id. at ¶35.[2] When he tried to walk, his "ankle caved in and dislocated itself from the ankle [*sic*]." Id. He complained for "weeks . . . about not having a 'CAM BOOT' to support [his] ankle," and Burnett eventually prescribed him "the wrong boot that caused the infection to begin with." Id. He says the infection occurred after he suffered a cut or sore on his foot from wearing the boot only a few days. Id. at ¶36. The plaintiff alleges that Burnett refused to provide him pain medication for his dislocated ankle, telling him instead that "prison is a terrible place[,] so [he's] just to suffer in pain." Id. at ¶49 (cleaned up).

The plaintiff complained about his infection to Dr. Labby, who "ordered wound care" and kept him in the prison infirmary. Id. at ¶36. A week later, medical staff determined that the plaintiff's wound was infected and sent him to ThedaCare Emergency Room on November 30, 2021. Id. Doctor Cruz-

---

[2] The complaint does not say when the plaintiff was released from the hospital or how long he remained there for treatment.

Apolinario Maria (not a defendant) examined the plaintiff's foot and took an x-ray, which revealed that the plaintiff "had a dislocated right ankle with bone fragments around it." Id. She also noted "[e]xtensive neuropathic arthropathy" and "soft tissue swelling." Id. at ¶37. She recommended that the plaintiff see a podiatrist and advised him not to use the Cam Boot because his foot was swollen, which was "causing a lot of friction on his foot." Id. She advised him to stay off his foot and elevate it until he could see the podiatrist. Id. The plaintiff says that Cruz "was extremely concerned that if Redgranite MD did not follow her instructions the delay would cause severe damage to the already deformed right foot." Id. at ¶38 (underlining in original).

The next morning—December 1, 2021—the plaintiff saw Dr. Labby. Id. at ¶39. Labby reviewed Dr. Cruz's evaluation notes and wrote that the plaintiff had a "gen surgeon appt coming up for wound eval." Id. She wrote that the plaintiff would remain "in sick cell for now to encourage, and elevation, and while [staff] adjust diuretic to encourage fluid mobilization." Id. The plaintiff asserts that "Dr. Labby and the other defendants purposeful failed to follow Dr. Cruz's orders to take [him] to a podiatrist within a week" to avoid him losing his right foot or ankle. Id. at ¶40.

The plaintiff also alleges that "[u]pon returning to [Redgranite] on 9/28/21," Dr. Stonefeld put him on the medication carbomazapine, which he says "caused a major blood clot in his right pipatiel vain [sic] and again almost killed" him. Id. at ¶46 (capitalization omitted). The plaintiff says he is on a blood-thinner, and he says that the carbomazapine cleared the blood-thinner

8
Case 2:23-cv-01478-PP   Filed 03/14/24   Page 8 of 17   Document 9

and caused his blood clot. Id. at ¶47. He alleges that Stonefeld "refused to d[o] standard bloot [*sic*] test as is required by the drug company." Id. at ¶48. He says Stonefeld's "incompetence and deliberate indifference . . . caused severe medical emergencies that required a sonagram that showed [he] had a blood clot." Id.

The plaintiff claims that the defendants' actions violated his rights under the Eighth Amendment. Id. at 11. He seeks $30 million in damages for the loss of his right ankle and foot, another $30 million "for the pain and suffering and future pain [and] suffering and medical treatment aftercare" and $20 million "for mental [and] emotional pain [and] suffering." Id.

With his complaint, the plaintiff filed a "request to join both issues as they are intertwind [*sic*]." Dkt. No. 3. The plaintiff asks the court to allow him to proceed on his claims about his lithium toxicity and his dislocated ankle. Id. He says these claims "are intertwind [*sic*] as the cause of the dislocated ankle is directly related to the lithium toxicity." Id. He "believes that F.R.C.P. 18(a)(b) allows this honorable court to join both [his] claims of injuries by all defendants as they are the same defendant's [*sic*] that violated [his] 8th amendment." Id.

C. Analysis

The court begins by addressing the plaintiff's request to allow him to proceed on his claims about his lithium toxicity and his ankle injury. The plaintiff says the two claims are intertwined. He does not elaborate on that assertion. But as the court understands it, the plaintiff is alleging that in

August 2018 he developed lithium toxicity, which caused him to be bedridden for forty-six days in the prison infirmary and then hospitalized for an undisclosed amount of time. Being bedridden caused the muscles and bones in his right ankle to weaken and atrophy because of his preexisting arthropathy. In September 2021, sometime after the plaintiff returned to the prison from his hospitalization, he attempted to walk but dislocated his ankle. The defendants placed the plaintiff in a walking boot, which caused a cut or sore on his swollen ankle that became infected. An outside specialist recommended the plaintiff see a podiatrist and keep his foot elevated, but the defendants did not follow those instructions. The plaintiff alleges that because of this delay in treatment, he will have to have his right ankle and/or foot amputated, but that prison medical staff will not perform the amputation before the plaintiff's release in April 2024.

While it is acceptable for a plaintiff to bring multiple claims against the same party in a single case, a plaintiff cannot bring *unrelated* claims against different defendants in the same case. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007); Fed. R. Civ. P. 18(a) and 20(a)(2). "Joinder that requires the inclusion of extra parties is limited to claims arising from the same transaction or series of related transactions." Wheeler v. Wexford Health Sources, Inc., 689 F.3d 680, 683 (7th Cir. 2012). In other words, the plaintiff may bring both of his claims against the defendants in one lawsuit "only if both claims arise 'out of the same transaction, occurrence, or series of transactions or occurrences.'"

Id. (citing Fed. R. Civ. P. 20(a)(1)(A)); id. ("A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot.").

At this point, the court cannot determine whether the plaintiff's two claims are related for purposes of joinder under Rules 18 and 20. The complaint is disorganized and somewhat difficult to follow. The court understands the plaintiff to allege that in August 2018, Dr. Stonefeld prescribed him 600mg of lithium, and that he developed lithium toxicity within a month. Dkt. No. 1 at ¶20. He was kept on bedrest in the infirmary for forty-six days and then hospitalized beginning on September 23, 2018. Id. at ¶27. He says he was treated for lithium toxicity at the hospital, but he does not say how long he remained there receiving treatment. He later alleges that on September 28, 2021, "upon returning to [Redgranite]," he was provided further inadequate medical attention. Id. at ¶46. This series of allegations suggests one of three scenarios: 1) the plaintiff remained in the hospital for *three years* being treated for lithium toxicity; 2) there is a typo in the complaint, and the plaintiff either was treated for lithium toxicity in September 2021 or he returned from the hospital to Redgranite on September 28, 2018; or 3) the plaintiff was treated for lithium toxicity in 2018 and suffered his ankle injury three years later, well after he returned from the hospital to Redgranite.

Under any of these scenarios, one or both of the plaintiff's claims may be untimely. The statute of limitation for claims brought under §1983 is "the statute of limitations for personal injuries supplied by the state in which the claim arose." Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing

Wallace v. Kato, 549 U.S. 384, 387 (2007)). The limitation period for §1983 claims arising in Wisconsin is the three-year limitation provision found in Wis. Stat. §893.54 (2018). Wisconsin previously allowed a six-year limitations period but in 2018 reduced that limitations period to three years. See Huber, 909 F.3d at 207 (citing 2017 Wis. Act 235 (eff. Apr. 5, 2018)) (reducing applicable statute of limitations from six to three years). The three-year limitation period applies to causes of action accruing on or after April 5, 2018.

The plaintiff signed his complaint on November 1, 2023, so the court considers that to be the filing date. Dkt. No. 1 at 11; see Taylor v. Brown, 787 F.3d 851, 859 (7th Cir. 2015). That means the complaint is untimely for any claims that occurred before November 1, 2020. The complaint alleges that the plaintiff suffered lithium toxicity in August to September 2018. It appears that claim may be untimely because it occurred before November 2020. The complaint alleges that the plaintiff suffered his ankle injury in September 2021, which would mean that claim is timely. But if the complaint reflects an incorrect date, and the plaintiff suffered his ankle injury in September 2018, that claim also may be untimely. If both of the plaintiff's medical issues occurred in 2021, then neither of his claims are untimely, and the court may determine that his two claims are related and properly joined under Rules 18 and 20.

There is one other issue further complicating things. The plaintiff claims that in September 2021 (if that date is correct), Dr. Stonefeld put him on a medication (carbomazapine) that caused him to develop a blood clot. He claims

12
Case 2:23-cv-01478-PP   Filed 03/14/24   Page 12 of 17   Document 9

that Stonefeld was deliberately indifferent because the plaintiff was taking a blood thinner, and Stonefeld should have realized that the plaintiff should not also take carbomazapine because it could cause him to develop the clot. This claim is distinct from the plaintiff's claim about his ankle, though it involves Stonefeld as a common defendant with his claim about lithium toxicity. But as the court has explained, the plaintiff's claim about lithium toxicity may be untimely. If that is correct, then the plaintiff cannot bring his claim against Stonefeld about the blood clot *and* his claim about his ankle injury in the same lawsuit, because those claims are not related and do not have defendants in common. The plaintiff does not assert, either in his motion for joinder or in his complaint, that these two claims (blood clot and ankle injury) are intertwined and belong in the same lawsuit.

Ordinarily, the court would reject the plaintiff's complaint "either by severing the action into separate lawsuits or by dismissing the improperly joined defendants." Owens v. Hinsley, 635 F.3d 950, 952 (7th Cir. 2011) (citing Fed. R. Civ. P. 21). The court would give the plaintiff an opportunity to choose which of the above-described unrelated claims he wants to proceed on in this case. But the court will not do so here because it is not clear whether any of the plaintiff's claims are timely or, if they are, whether they are related and have defendants in common sufficient to allow them to be brought in the same lawsuit. The court will order the plaintiff to respond to this order and provide the following additional information:

1) When (in which months of which years) was he treated for lithium toxicity?

2) For how long was the plaintiff hospitalized and treated for lithium toxicity (on what date did he go into the hospital for the lithium toxicity and on what date was he released)?

3) When (during which months and which years) did the plaintiff suffer his ankle injury at Redgranite?

4) When (in what month of what year) did Dr. Stonefeld put the plaintiff on carbomazapine?

5) When (in what month of what year) did the plaintiff develop the blood clot?

After the plaintiff provides this additional information, the court will screen the complaint to determine which of the plaintiff's claims is timely (if any), which of the timely claims are related and which of those timely and related claims may proceed in this lawsuit. The plaintiff must file his response to this order in time for the court to *receive* it by the end of the day on **April 19, 2024**. If the plaintiff does not timely respond to this order, or if his response does not answer the court's questions, the court may dismiss the complaint for violating Rules 18 and 20 and may dismiss the lawsuit for the plaintiff's failure to diligently litigate it. See Civil Local Rule 41(c) ("Whenever it appears to the Court that the plaintiff is not diligently prosecuting the action . . . the Court may enter an order of dismissal with or without prejudice."). The court will not take any further action on the plaintiff's complaint until he responds to this order or until the **April 19, 2024** deadline has passed, whichever is first.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **RESERVES RULING** on the plaintiff's motion for joinder. Dkt. No. 3.

The court **ORDERS** that the plaintiff must respond to this order in writing and provide the additional information the court requests by the end of the day on **April 19, 2024**. The plaintiff must file his written response in time for the court to *receive* it by the end of the day on April 19, 2024. If the court does not receive a written response by day's end on April 19, 2024, or if the plaintiff's response does not provide correct and sufficient information, the court may dismiss the case for the plaintiff's failure to diligently litigate it.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$324.36** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Dodge Correctional Institution.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[3] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

>  Office of the Clerk
>  United States District Court
>  Eastern District of Wisconsin
>  362 United States Courthouse
>  517 E. Wisconsin Avenue
>  Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court

---

[3] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 14th day of March, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**